IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHANNON M. DELLINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:19CV356 |
| | ) |
| ANDREW SAUL, | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Shannon M. Dellinger brought this action to obtain review of a final decision of the Commissioner of Social Security[1] that terminated her Supplemental Security Income ("SSI") benefits. The Court has before it the certified administrative record and cross-motions for judgment.

### I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI on October 25, 2010 alleging a disability onset date of December 31, 2009. (Tr. 191-196.) On April 29, 2011, Plaintiff was found to be disabled

---

[1] Andrew Saul was confirmed as the Commissioner of Social Security on June 4, 2019 and was sworn in on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

under the Act as of October 12, 2010. (Tr. 90, 93.) On July 9, 2015, the agency concluded that Plaintiff's disability ceased as of July 1, 2015. (Tr. 93-97.) This determination was upheld on reconsideration after a disability hearing by a State agency Disability Hearing Officer. (Tr. 118-29.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which she attended on December 18, 2017, along with her attorney and a vocational expert. (Tr. 61-89, 133-136.) In his May 31, 2018 decision, the ALJ determined that Plaintiff was no longer disabled under the Act as of July 1, 2015, and that she has not been disabled since that date. (Tr. 31-60.) On March 11, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. (Tr. 1-8.)

## II. STANDARD FOR REVIEW

The scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The issue before the Court is not whether Plaintiff is disabled but whether the finding that she is not disabled is supported by substantial evidence and based upon a correct application of the relevant law. *Id.*

2

Case 1:19-cv-00356-TDS-JLW   Document 14   Filed 06/09/20   Page 2 of 20

### III. The Eight Step Evaluation Process

When determining whether a claimant who has previously been found to be disabled continues to be disabled, the ALJ uses an eight-step sequential evaluation process. This eight-step process provides that: (1) if the claimant is engaging in substantial gainful activity, disability ends; (2) if the claimant has an impairment or combination of impairments that meets or medically equals a listing, disability continues; (3) if the claimant does not meet or equal a listing, the ALJ will determine whether "medical improvement" has occurred;[2] (4) if medical improvement has occurred, the ALJ will determine whether the improvement is related to the claimant's ability to work; (5) if there is no medical improvement, or the medical improvement is found to be unrelated to the claimant's ability to work, disability continues, subject to certain regulatory exceptions; (6) if there has been medical improvement related to the claimant's ability to work, the ALJ will determine whether all of the current impairments, in combination, are "severe," and if not, disability ends; (7) if the claimant's impairments are considered "severe," the ALJ will determine the claimant's residual functional capacity ("RFC"), and if the claimant is able to perform past relevant work, disability ends; (8) if the claimant is unable to perform past relevant work, the ALJ will determine whether the claimant can perform other work given his or her RFC, age, education, and past work experience. *See* 20 C.F.R. §

---

[2] The Social Security regulations define "medical improvement" as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 416.994(b)(1)(i). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with your impairment(s)." *Id.*

416.994(b)(5); *Tickle v. Berryhill*, No. 1:16CV204, 2017 WL 3382463, at *3 (M.D.N.C. Aug. 4, 2017) (describing the eight-step process).

**IV. The ALJ's Decision**

In deciding that Plaintiff is no longer entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

1. The most recent favorable medical decision finding that the claimant was disabled is the determination dated April 29, 2011. This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, the claimant had the following medically determinable impairments: chronic liver disease and cirrhosis; and affective disorder. The claimant's liver impairments were found to meet [Listing] 5.05B2(a) . . . .

3. The medical evidence establishes that, since July 1, 2015, the claimant has had the following medically determinable impairments: chronic liver disease and cirrhosis; history of seizures; history of tracheotomies with bilateral vocal fold hypomobility; migraine headaches; lumbar and thoracic degenerative joint disease with radiculopathy; depressive disorder; anxiety and panic disorder; and history of alcohol use disorder, in sustained remission. These are the claimant's current impairments.

4. Since July 1, 2015, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment . . . .

5. Medical improvement occurred on July 1, 2015 . . . .

6. The medical improvement is related to the ability to work because, by July 1, 2015, the claimant's CPD impairment(s) no longer met or medically equaled the same listing(s) that was met at the time of the CPD.

7. Since July 1, 2015, the claimant has continued to have a severe impairment or combination of impairments . . . .

8. Since July 1, 2015, based on the current impairments, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except as follows: The claimant can sit for a total of six hours in an eight-hour workday. The claimant can stand and/or walk for a total of two hours in an eight-hour workday and must use a cane with the dominant right upper extremity when standing or walking. The claimant can light [sic] and carry twenty pounds occasionally and ten pounds frequently. The claimant can never climb ladders, ropes, and scaffolds, but can occasionally navigate ramps and stairs. The claimant can frequently stoop, kneel, crouch, and crawl, but only occasionally balance. The claimant must avoid concentrated exposure to fumes, dust, gases, and other pulmonary irritants, as well as workplace hazards such as unprotected heights and moving mechanical parts. The claimant can perform simple, repetitive, routine tasks at a non-production pace rate. The claimant can have no more than frequent interaction with coworkers and supervisors, and no more than occasional interaction with the general public . . .

9. Since July 1, 2015, the claimant has been unable to perform past relevant work . . . .

10. On July 1, 2015, the claimant was a younger individual age 18-44 . . .

11. The claimant has at least a high school education and is able to communicate in English . . . .

12. Since July 1, 2015, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills . . .

13. Since July 1, 2015 considering the claimant's age, education, work experience, and residual functional capacity based on the current impairments, the claimant has been able to perform a significant number of jobs in the national economy . . . .

14. The claimant's disability ended on July 1, 2015, and the claimant has not become disabled again since that date . . . .

(Tr. 36-52.)

## V. ISSUE AND ANALYSIS

Plaintiff's sole contention is that the ALJ erred "by rejecting . . . the opinion(s) of Plaintiff's treating physician(s)[.]" (Docket Entry 11 at 2 (all cap in original).) In developing this argument, the only medical providers that Plaintiff specifically mentions and discusses are Drs. John G. Spangler, Kateland Elizabeth Branch Napier, and Robert Rominger. (*Id.* at 5-7.) Consequently, the Court will evaluate Plaintiff's contentions as to these medical providers. Plaintiff also makes one passing and indirect reference, through a pinpoint page citation, to three other medical providers: Drs. Adam Carl Satteson, Joshua Lee Wilson, and Mark Russo. (*Id.* at 5, referencing Tr. 1158 (Russo letter), 1187 (Satteson letter), 1188 (Wilson letter).) However, the failure to develop any argument regarding these medical providers is fatal to any challenge involving them.[3] And, even if it were not, the ALJ's assessment of their opinions appears both legally correct and supported by substantial evidence. As explained in detail below, Plaintiff's argument is without merit and should therefore be denied.

The treating source rule requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. § 416.927(c)(2).[4] The rule also recognizes, however, that not all treating sources or treating

---

[3] In other words, Plaintiff's failure to develop any argument as to Drs. Satteson, Wilson, and Russo (or any other medical provider she leaves unmentioned) waives any claim involving them. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Hughes v. B/E Aerospace, Inc.*, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.").

[4] These regulations apply for applications, like Plaintiff's, filed before March 27, 2017. *See* 20 C.F.R. § 416.927. For applications filed on or after March 27, 2017, a new regulatory framework for considering and articulating the value of medical opinions has been established. *See id.* § 416.920c; *see*

source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. *See* 20 C.F.R. § 416.927(c)(2)(ii). A treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. *See* 20 C.F.R. § 416.927(c)(2)-(4); SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. The ultimate issue of whether a claimant is disabled is administrative and therefore reserved for the Commissioner. 20 C.F.R. § 416.927(d).

### A. Dr. Spangler

Plaintiff first points to statements made by her treating physician addressing her condition during the relevant period, and then faults the ALJ for dismissing these statements because that physician also stated that Plaintiff was completely disabled. (Docket Entry 11 at 5-7.) More specifically, Plaintiff references a four-page letter written by her treating physician, Dr. John G. Spangler, in November of 2017. (*Id.* referencing Tr. 1858-1861.) In that letter, Dr. Spangler discussed Plaintiff's condition at length and also concluded that she was completely disabled.[5] (*Id.*) According to Plaintiff, the ALJ erred by dismissing Dr. Spangler's

---

also 82 Fed. Reg. 5844-01, 2017 WL 168819 (revisions to medical evidence rules dated Jan. 18, 2017, and effective for claims filed after Mar. 27, 2017).

[5] For example, Dr. Spangler began that letter by writing that it was his "medical opinion that [Plaintiff] remain[ed] completely disabled due to [a] continued extraordinary number of medical and psychiatric disorders . . . . Together, all of these combine to prevent [her] from performing any employment or job functions." (Tr. 1858.) In support of this conclusion, Dr. Spangler wrote further that Plaintiff's (1) "major depression, anxiety and post traumatic stress disorder are worsening due to

7

entire letter solely on the grounds that it addressed a question reserved to the Commissioner, that is, the question of Plaintiff's disability. (Docket Entry 11 at 5-7.) While Plaintiff concedes that Dr. Spangler's conclusion that Plaintiff was disabled was entitled to no weight, she contends that the ALJ erred by ignoring the remainder of Dr. Spangler's letter. (*Id.*)

This would be a strong argument if it were an accurate description of the ALJ's evaluation of Dr. Spangler's letter. However, the problem with Plaintiff's position is that the ALJ's analysis of that letter is nowhere near as cursory as she alleges. In fact, the ALJ specifically pointed to Dr. Spangler's letter many times throughout the Decision and provided numerous reasons, backed by ample evidence, to partially discount it.

First, the ALJ cited to Dr. Spangler's letter (Exhibit 42F in the administrative record) and acknowledged Plaintiff's anxiety around others, which made it difficult to be in public spaces. (Tr. 38 referencing Tr. 1858-1859.) The ALJ then pointed again to Dr. Spangler's letter and noted that Plaintiff's increased anxiety often caused her to experience increased shortness of breath that contributed to her panic symptoms. (*Id.*) Nevertheless, the ALJ partially discounted these allegations of completely disabling social anxiety, correctly observing that

---

her recovery from alcoholism," (2) that Plaintiff "has flashbacks at night with racing thoughts and while asleep, nightmares," (3) and that "she is also extremely reluctant to leave home for anything because of fear of open places and lots of people." (Tr. 1858.) Dr. Spangler wrote further that Plaintiff's "alcoholism has clearly affected brain and cerebellar function [and that she] likely has brain atrophy and short term memory loss . . . poor coordination, extremely unsteady gait which is also wide-based, and recent falls." (Tr. 1859.) Dr. Spangler noted that Plaintiff "has a walker ordered" and that "[e]ven at rest [she] is short of breath" and that "[t]his makes her even more anxious and panicky[.]" (*Id.*) Dr. Spangler also noted that Plaintiff's migraines "have increased in frequency . . . which cause her to be completely debilitated when they occur." (*Id.*) Dr. Spangler ended his letter by concluding that, "[i]n this patient, unfortunately, her specific combinations of diseases exacerbate each other such that she is extraordinarily disabled" (Tr. 1861.)

8

Plaintiff maintained a number of close relationships with friends and family, attended her niece and nephews' sporting events, and attended weekly Alcoholics Anonymous meetings throughout the relevant period. (Tr. 38 referencing Tr. 1281, 1286, 1348, 1372, 1594, 1596, 1613, 1669.) The ALJ therefore concluded that Plaintiff had only a moderate limitation in this area and accommodated these limitations by adopting an RFC permitting Plaintiff to have no more than frequent interaction with coworkers and supervisors, and no more than occasional interaction with the general public. (Tr. 38, 41.)

Second, the ALJ pointed to Dr. Spangler's letter and noted that Plaintiff remained medicated in an effort to control her post-traumatic epilepsy and that she had been seizure free for a number of years. (Tr. 40 referencing Tr. 1859 (Dr. Spangler noting that "She is on Keppra and has had no recent seizure activity.").) Because the claimant reported no seizure activity to providers during the relevant period and received no instructions to alter her activities of daily living due to the possibility of seizures, the record supports the ALJ's finding that the claimant's seizure disorder has no more than a minimal effect on her ability to perform basic work activities and was therefore non-severe. (Tr. at 40-41.)

Third, the ALJ noted that after a 2010 hospitalization, Plaintiff had stopped using alcohol and has remained abstinent. (Tr. 41 referencing Tr. 1812.) The ALJ observed that Plaintiff began attending Alcoholics Anonymous meetings weekly and became the treasurer of her group after several years of attendance. (Tr. 41 referencing Tr. 1348, 1372, 1720.) The ALJ then pointed to Dr. Spangler's letter and noted that although participation in this recovery program occasionally worsened her panic and anxiety symptoms, her psychiatrist noted that

9

her mood remained stable and she remained abstinent from alcohol as recently as October 2017. (Tr. 41 referencing Tr. 1858, 1866-1867, 1874.) Because Plaintiff's alcohol use disorder remained in sustained remission throughout the relevant period, the ALJ was justified in concluding that there was no indication it significantly affected her ability to perform basic work activities. (Tr. 41.) The ALJ thus found it to be non-severe. (*Id.*)

Fourth, the ALJ accurately observed that Plaintiff's treatment records showed that her liver function remained stable over the remainder of the record. (Tr. 43.) Overall, providers felt that the claimant's liver disease remained well compensated with MELD scores[6] generally between six and eight, indicating only early cirrhosis. (Tr. 43 referencing Tr. 1380-1381, 1388, 1392, 1404, 1588, 1665, 1681, 1691.) As a result, the ALJ correctly noted that the claimant had been removed from the transplant list by March 2016 and was off the list for the majority of the longitudinal record after that date. (Tr. 43 referencing Tr. 1351, 1363, 1525, 1543, 1689, 1859.) In partial support of this, the ALJ pointed to Dr. Spangler's letter, which acknowledged that as of November of 2017, Plaintiff was not on the list. (Tr. 43 referencing Tr. 1859.)

Fifth, the ALJ referenced Dr. Spangler as Plaintiff's "primary care provider," and cited his opinion letter, noting that it "reported that she had been experiencing an increased frequency of migraines without an effective preventive medication[.]" (Tr. 45 referencing Tr. 1859.) Nevertheless, the ALJ went on to explicitly discount Dr. Spangler's conclusion, noting

---

[6] "MELD (Model for End Stage Liver Disease) is a numerical scale used to prioritize patients waiting for a liver transplant. The range is from 6 (less ill) to 40 (gravely ill) and is calculated using the most recent laboratory tests. The MELD score determines how urgently a patient needs a liver transplant within the next three months." *Martin v. Colvin*, No. CV 6:15-4886-CMC-KFM, 2017 WL 9289385, at *5 (D.S.C. Jan. 4, 2017) (citation omitted).

that Plaintiff's most recent neurology notes did not support this assertion. (*Id.*) Instead, the ALJ observed, Plaintiff's neurologist noted that she had reported that her medication helped her headaches, and he remained hopeful that her headaches would improve with decreased stress and anxiety. (Tr. 45 referencing Tr. 1591, 1594.) He did not recommend any medication changes at that time. (*Id.*)

Sixth, Plaintiff again referred to Dr. Spangler as Plaintiff's "primary care provider," and again cited to his November 2017 letter, noting that he had reported "that the claimant had complained of worsened panic symptoms recently due to dealing with some past trauma in Alcoholics Anonymous meetings[.]" (Tr. 46 referencing Tr. 1858-1859.) However, the ALJ correctly observed that "neither her psychologist nor her psychiatrist noted any reports of significant interference in functioning as described by her primary care provider." (*Id.*) Instead, her psychiatrist had noted she seemed stable on her current medication regimen. (Tr. 46 referencing Tr. 1867, 1871.)

Seventh, citing in part Dr. Spangler's November 2017 letter, the ALJ noted that Plaintiff's anxiety and reported panic attacks supported limited interaction with others. (Tr. 47 referencing Tr. 1858-1859.) However, the ALJ also reasoned that Plaintiff's extensive activities of daily living—including caring for others, driving a car, and serving as treasurer for her Alcoholics Anonymous group—did not support a conclusion that these limitations were work preclusive. (Tr. 38-39, 45, 47-48, 49.)[7] The ALJ also noted Plaintiff's deficits with abnormal

---

[7] (*See* Tr. 47 referencing Tr. 1281 ("Ms. Dellinger is very active in family activities" and "spends some of her time babysitting her best friend's grandchildren"), 1286 (describing Plaintiff as "busy with watching children, gardening, watering flowers, and cleaning for her mother-in-law"), 1348 ("Shannon

11

balance and gait, but concluded that in light of her activities of daily living,[8] and in light of other record evidence, she could perform a reduced range of sedentary work. (*See, e.g.*, Tr. 43-44 referencing Tr. 1523-1524 ("Would like to start going to YMCA" and "Normal range of motion"), 1550 ("Gait slow but normal"), 1594 ("Routine gait normal."), 1646 ("Routine gait normal.").) The ALJ concluded that this evidence supported a conclusion that Plaintiff could perform a reduced range of sedentary work. (Tr. 41, 43-44.)

Eighth, the ALJ cited Dr. Spangler's November 2017 letter, noting that it "opined that the claimant remained completely disabled due to her combination of medical and psychiatric conditions that prevented her from performing any employment or job functions without severe distress and medical and/or psychiatric decompensation[.]" (Tr. 49 referencing Tr.

---

said she has decided to put off the recommended procedure to improve her breathing. Though she gets short of breath, she noted that [she] can find the energy to look after her friends' children, two of whom are currently going through potty training. Shannon reported that she is managing her job as treasurer of her AA. group better by just keeping good records. She has continued visiting her grandmother, as well."), 1372 ("In addition to keeping her friend's children throughout much of the week, including a baby that wants to be held almost constantly, Shannon described her weekends as full with attending niece's and nephew's ball games, church activities, and family events."), 1594 ("patient driving"), 1613 ("Though she said she is most content when she is watching the children, she noted continuing to do things with family and to visit her grandmother. She described her grandmother's nursing home as, 'the nicest place you've ever been,' and said she and Danny are planning to attend a Saint Patrick's Day concert there tomorrow."), 1669 ("Reporting that she had just come from visiting her grandmother . . . . Shannon noted that she has begun doing her grandmother's laundry for her. . . . Shannon noted that she and Danny are going to install a fence this afternoon . . . . Shannon said she promised to help her sister look for a job. . . . Watching children just some of the time recently . . . . Whereas [Plaintiff and ex-husband] would usually take [his] mother to a gospel sing and to yard sales along Hwy 58 this Memorial Day weekend, Shannon said just she and Danny are going because his mother apparently injured herself. Shannon identified planting and going to church as activities she does for herself."); *see also* Tr. 45 referencing Tr. 1133 (ALJ noting that the claimant denied a need for psychiatric hospitalization and noted that she wanted to be available to help care for a pregnant friend.)

[8] *Supra* note 7.

12

1858, 1861.) However, the ALJ concluded that because "Dr. Spangler did not provide any additional assessment of the claimant's functional abilities, [he] cannot afford his statement any weight." (Tr. 49.) The ALJ was correct in this assessment, because as noted, the ultimate issue of whether a claimant is disabled is administrative and therefore reserved for the Commissioner. 20 C.F.R. § 416.927(d).

Ninth, the ALJ also pointed to additional medical opinions that supported the conclusion that, while Plaintiff had a number of impairments, she could still perform a reduced range of sedentary work. For example, the ALJ concluded that the opinions of state agency consultants Frank Virgili, M.D, Hari Kuncha, M.D., and Sharon J. Skoll, Ph.D. were largely consistent with the longitudinal record. (Tr. at 47-48 referencing Tr. 1051-1058, 1159-1167, 1169-1185.) The ALJ therefore afforded their opinions great weight and adopted numerous restrictions identified in those opinions into Plaintiff's RFC. (Tr. 47.)

Plaintiff does not challenge any of these particular factual findings or contend that they are not supported by substantial evidence. Instead, as noted, Plaintiff's contention is that the ALJ erred by dismissing Dr. Spangler's entire letter solely on the grounds that it addressed a question reserved to the Commissioner. As demonstrated above, however, Plaintiff's argument is built upon a misreading of the ALJ's decision. Far from ignoring Dr. Spangler's letter, the ALJ gave many reasons, supported by substantial evidence, for partially discounting it. *See Russell v. Comm'r of Soc. Sec.*, 440 F. App'x 163, 164 (4th Cir. 2011) ("If the ALJ does not give the treating physician's opinion controlling weight, she must give good reasons in her notice of determination or decision for the weight she gives the treating source's opinion.")

13

(internal quotations, citations, and alterations omitted); SSR 96-2P, 1996 WL 374188, at *5 ("[T]he decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). Consequently, this argument has no merit and should be denied.

### B. Dr. Napier

Plaintiff also implies that the ALJ erred by failing to afford greater weight to the medical opinion of Kateland Elizabeth Branch Napier, M.D. (Docket Entry 11 at 7.) Dr. Napier provided a letter on March 16, 2017 regarding Plaintiff's mental condition. (Tr. 1856.) It reads as follows:

> Ms. Dellinger is being treated at our clinic for major depressive disorder, PTSD and unspecified anxiety disorder. I have been treating her since July 2016, and she has been seen by other resident physicians at Wake Forest prior to that under the supervision of our attending physicians. She has been compliant with our treatment recommendations and is reliable in taking her medication. Her conditions have responded somewhat to medication management, but it is our feeling that, given her multiple comorbid medical conditions, her anxiety and depressive symptoms are unlikely to improve dramatically without substantial improvement in her physical health. I would urge you to consider these symptoms and conditions in your consideration of her case for disability, as her medical prognosis does significantly contribute to worsening of her mental health.

(Tr. 1856.)

The ALJ addressed Dr. Napier's medical opinion and afforded it "little weight." (Tr.

14

49.) Specifically, the ALJ accurately pointed out that Dr. Napier's opinion "did not provide any assessment of the claimant's functional abilities" and therefore afforded "little weight in determining any limitations from those conditions." (*Id.*) This decision is both legally correct and supported by substantial evidence. The ALJ considered all the impairments Dr. Napier addressed (Tr. 34-53), and the fact of the existence of those impairments is undisputed. However, Dr. Napier failed to articulate any limiting effects of these impairments and this supports the ALJ's decision to give her opinion little weight. *See, e.g.*, *Miller v. Colvin*, No. 6:13-CV-00165-JMC, 2014 WL 4955230, at *24 (D.S.C. Sept. 30, 2014) ("[T]he fact of the plaintiff's pain is undisputed; the issue was the limiting effects of the plaintiff's pain and other symptoms. Here, the ALJ gave specific reasons for giving little weight to Dr. Niemer's opinion, which set forth no functional limitations. . . . [T]his allegation of error is without merit.").

### C. Dr. Rominger

Plaintiff also argues that the ALJ erred in affording consideration to only a portion of the medical opinion provided by her treating psychologist, Robert Rominger, PhD. (Docket Entry 11 at 7.) Dr. Rominger wrote a letter on November 27, 2017. (Tr. 1863.) It reads as follows:

> I have been providing psychotherapy to Ms. Dellinger through the Internal Medicine outpatient clinic periodically since 2010, shortly after she quit drinking alcohol out of fear over its impact on her health.
>
> Although her medical conditions are well documented and, taken together impair her functioning to the degree that she could not be expected to support herself through regular employment, I wish to add my medical opinion that Ms. Dellinger's ability to function is further complicated by her mental health conditions,

15

> which include posttraumatic stress disorder, generalized anxiety, panic disorder, and major depressive disorder, all of which undermine her persistence, pace, and stamina. While any of these conditions has the potential to be disabling on its own, their combination, especially in conjunction with her physical limitations, render her impaired for regular participation in the workforce.

(*Id.*)

As indicated above, opinions that a claimant is disabled or unable to work are "opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 416.927(d). Here, the ALJ heeded the requirements of § 416.927(d) and did not award any special significance to Dr. Rominger's conclusion that Plaintiff is disabled or unable to work, because it was not a medical opinion, "but is instead an opinion reserved to the Commissioner." (Tr. 49.) Beyond this, the ALJ did not wholly disregard Dr. Rominger's opinion. Instead, the ALJ partially credited Dr. Rominger's conclusion that Plaintiff's conditions would affect her concentration, persistence, and stamina. (Tr. 49, 1863.) Specifically, the ALJ concluded that Plaintiff's mental impairments caused moderate limitations, finding that Plaintiff could "perform simple, repetitive, routine tasks at a non-production pace rate." (Tr. 38, 41, 49-50, 1863.) The ALJ also limited Plaintiff to only a reduced range of sedentary work. (Tr. 41.) Thus, substantial evidence supports the weight given to Dr. Rominger's opinion.

### D. Dr. Satteson

Adam Carl Satteson, M.D., one of Plaintiff's medical care providers, wrote a brief letter in December of 2015 stating, in pertinent part, that he had "treated Ms. Dellinger for about 3

16

years and she has been treated in our practice for longer. She has significant limitations in her physical activity due to breathing restrictions from bilateral vocal cord paralysis that developed after a trauma many years ago." (Tr. 1187.)

The ALJ considered this opinion and afforded it "little weight," explaining that,

> Although the record does establish some shortness of breath across the longitudinal record, the claimant declined offered procedures that would improve her breathing, noting that she could still help watch her friends' young children throughout the week as recently as July 2017 (Ex. 34F/9). At that time, she reported that she continued to work in her garden, water flowers, and help clean for her mother-in-law, which kept her too busy to think about having the offered procedures (Ex. 34F/9). Overall, the claimant's reports of her activities of daily living do not support the level of severity Dr. Satteson suggested.

(Tr. 48-49 referencing Tr. 1286.)

At no point does Plaintiff explain why she contends (if she does indeed contend) that the ALJ erred in his evaluation of Dr. Satteson's opinion. Nor is it clear how she could. As the ALJ accurately pointed out, Plaintiff's activities of daily living provide substantial evidence for the conclusion that Plaintiff's shortness of breath is not disabling. (*Id.*; *supra* n. 7.)

### E. Dr. Wilson

Joshua Lee, Wilson, M.D., the claimant's gastroenterologist, wrote a letter on January 4, 2016 regarding the claimant's condition stating that

> I have followed Ms. Dellinger in the gastroenterology clinic for the past 6 months for cirrhosis with complications to include hepatic encephalopathy, varices and jaundice. She has been followed in the Wake Forest GI practice for many years and is also followed at Carolinas Medical Clinic liver transplant clinic. We continue to assist in management of her hepatic encephalopathy and other aforementioned complications of her

>liver disease.

(Tr. 1188.)

The ALJ considered this letter, but afforded it "little weight," explaining that, "Because Dr. Wilson did not provide any assessment of the claimant's functional abilities, the undersigned affords his statement little weight in determining any limitations from those conditions." (Tr. 49.) Again, Plaintiff fails to explain why she believes this assessment is in error (if she indeed holds that position) and there appears to be no reason to conclude otherwise. The ALJ considered all the impairments Dr. Wilson addressed (Tr. 34-53), and the fact of the existence of those impairments is undisputed. However, Dr. Wilson failed to articulate any limiting effects of these impairments and this supports the ALJ's decision to give his opinion little weight. *See, e.g.*, *Miller*, 2014 WL 4955230, at *24.

### F. Dr. Russo

Mark Russo, M.D. wrote a letter on August 6, 2015 stating that "Ms. Dellinger is under my care for end stage liver disease and cirrhosis. She experiences severe fatigue, forgetfulness, shortness of breath, and low energy. She says she is unable to climb stairs due to leg weakness and loses her balance." (Tr. 1158.) Dr. Russo also wrote a letter on February 9, 2016 in which he stated that Plaintiff was "under my care for decompensated cirrhosis. She has been under my care and has been compliant. She is dependent on her medication to prevent complications such as variceal bleeding. She is compliant with medications and would not be able to afford them without insurance." (Tr. 1405.)

The ALJ took these letters into consideration and explained that:

18

> Dr. Russo noted that the claimant remained under his care for end stage liver disease and cirrhosis, which caused severe fatigue, forgetfulness, shortness of breath, and low energy. He noted that the claimant reported she could not climb stairs due to leg weakness and poor balance (Ex. 23F/4). In February 2016, he reiterated that the claimant remained under his care and compliant with medications that she would not be able to afford without insurance (Ex. 36F/19). The undersigned considered Dr. Russo's opinion as a treating physician, but afforded it little weight. Dr. Russo did not provide any opinion regarding the claimant's residual functional capacity to perform basic work activities, although he did note that she had difficulty with balance and climbing stairs. Accordingly, the undersigned has taken this portion of Dr. Russo's opinion into consideration when formulating the above residual functional capacity.

(Tr. 48 referencing Tr. 1158, 1405.)

Again, Plaintiff fails to explain why she believes this assessment is in error (if she indeed holds that position) and there appears to be no reason to conclude otherwise. The ALJ considered all the impairments Dr. Russo addressed (Tr. 34-53), and the fact of the existence of those impairments is undisputed. However, Dr. Russo failed to articulate any limiting effects of these impairments and this supports the ALJ's decision to give his opinion little weight. *See, e.g., Miller*, 2014 WL 4955230, at *24. The only exception to this is Dr. Russo's observation that Plaintiff had deficiencies in balance and in the ability to climb stairs. However, the ALJ partially credited these observations by limiting Plaintiff to a reduced range of sedentary work and only the occasional climbing of stairs. (Tr. 41.) In light of Plaintiff's activities of daily living and other evidence of record (discussed in detail earlier in this Recommendation), the ALJ's decision to partially credit Dr. Russo's observation was supported by substantial evidence. (Tr. 43-44.)

19

## VI. CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is legally correct and supported by substantial evidence. Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for Judgment (Docket Entry 10) be **DENIED**, Defendant's Motion for Judgment on the Pleadings (Docket Entry 12) be **GRANTED**, and the final decision of the Commissioner be upheld.

Joe L. Webster
United States Magistrate Judge

June 9, 2020
Durham, North Carolina